UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────────────

HELENA KEENE f/b/o J.T.,

          Plaintiff,

                            10-cv-00360

       v.                    (WGY)

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

          Defendant.

───────────────────────────────────────

WILLIAM G. YOUNG, United States District Judge[1]

**<u>DECISION and ORDER</u>**

## I.   INTRODUCTION

Helena Keene brings this action on behalf of her son, J.T.[2] under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") that denied her claims for Supplemental Security Income ("SSI") benefits. Compl., ECF No. 1.

### A.   Procedural Posture

Helena Keene ("Keene") applied for SSI benefits on behalf of

───────────────────────

[1] Of the District of Massachusetts, sitting by designation. Reassignment Order, ECF No. 21.

[2] J.T. is a minor.  Thus, in accordance with Rule 5.2(a) of the Federal Rules of Civil Procedure, he will be referred to either as "Claimant" or by his initials.

J.T. on February 9, 2007.  Admin. R. at 89-92, ECF No. 9.  On May
30, 2007, the Regional Commissioner denied Keene's application.
Id. at 60-63.  Keene filed a request for a hearing by an
Administrative Law Judge (the "hearing officer") the following
day.  Id. at 43.  On April 24, 2009, the hearing officer issued a
decision finding that J.T. was not disabled.  Id. at 43-56.
After the Appeals Council denied Keene's request for further
review on January 27, 2010, the hearing officer's decision became
final.  Id. at 1-4.

On March 26, 2010, Keene filed the present action with this
Court to review the decision of the Commissioner pursuant to 42
U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  See Compl. 1-4.
The government filed an answer, Def.'s Answer, ECF No. 8, and
both sides filed briefs in support of their respective positions.
Issues Presented Review ("Pl.'s Mem."), ECF No. 17; Mem. Law
Supp. Def.'s Mot. J. Pleadings ("Def.'s Mem."), ECF No. 19.

**B.  Facts of Record**

**1.  Background**

J.T. was born on February 28, 1999.  Admin. R. at 46.
J.T., while physically healthy, is a child with an attention
deficit hyperactivity disorder ("ADHD").  Id. at 47.  In November
2002, the Albany County Health Department, prompted by Keene's
concerns regarding delays in J.T.'s overall development,
conducted a Multidisciplinary Evaluation of the three-year-old

2

child.  Id. at 222.  Testing revealed deficiencies in
intelligence and achievement, see id. at 223, 226, 230, in social
and emotional functioning, see id. at 223, 226-27, 230, in fine
motor skills, see id. at 223, 227, 230, and in all communication
skills, see id. at 224, 228-29, 231.  After meeting the criteria
to receive services through the Committee on Preschool Special
Education, J.T. was recommended to receive speech and language
therapy, occupational therapy, and other special education
services in a structured setting.  Id. at 231-32.

### 2.  Mental Impairments

#### a.  Treating Physician

J.T. has received primary health care from the Whitney M.
Young, Jr. Health Center since birth.  Id. at 116.  On May 25,
2005, at age six, J.T. was diagnosed with ADHD, and his
pediatrician, Dr. Estrella Esguerra ("Dr. Esguerra"), prescribed
him medications (including Ritalin).  Id. at 182.

At a doctor's visit on March 20, 2007, after Keene informed
the doctor that J.T.'s medication had not been working, Dr.
Esguerra prescribed J.T. 27 mg of Concerta, continued a
preexisting dosage of 5 mg of Ritalin to be taken at noon, and
added Clonidine to help with sleep issues.  Id. at 203-04.  On
April 12, 2007, the doctor noted that J.T. had a decreased
appetite and had lost weight.  Id. at 161-62.  Because J.T. often
became quiet and stared after taking his medication, Dr. Esguerra

recommended discontinuing the noon dose of Ritalin.  Id.  At a
doctor's visit on May 15, 2007, Keene and J.T.'s teacher informed
Dr. Esguerra that Concerta "does not work for [J.T.]."  Id. at
163.  Dr. Esguerra herself observed that J.T. was very active
during the appointment and noted his short attention span.  Id.
at 164.  The doctor then prescribed 20 mg of Ritalin per day,
with 10 mg of Ritalin to be taken in the afternoon.  Id.

    Doctor's notes from October 22, 2007, indicated that J.T.'s
daily dosage of Concerta had risen to 36 mg.[3]  Id. at 394.  J.T.'s
school nurse, however, noted that Concerta did not work well and
that the school was out of that medication.  Id.  The doctor's
notes also indicated that J.T. was still hyperactive, had
problems focusing, is easily distracted, took too long to
complete his homework, and experienced difficulty interacting
with peers.  Id.  Even though J.T.'s teachers were concerned
about his continued symptoms and were unable to control him, the
teachers noted that J.T.'s "[g]rades [were] doing well."  Id.  In
assessing J.T.'s general appearance, Dr. Esguerra observed that
J.T. was "alert, active, pleasant, well nourished and hydrated."
Id.  Dr. Esguerra questioned J.T.'s compliance with regard to
taking his medication but nevertheless proceeded to prescribe him
36 mg and 0.1 mg of Concerta and Clonidine, respectively.  Id.

---

[3] Information in the record suggests that J.T.'s dosage of
Ritalin was eventually phased out, id. at 394; when exactly this
transition occurred, however, is not clear.

On December 12, 2007, Dr. Esguerra again noted that J.T.'s school reported being out of required medication and was requesting a three-month supply of said medication.  Id. at 392. J.T.'s teachers reported that they were happy with his progress, remarking that J.T. had problems when he was not on medication. Id.  Nonetheless, J.T. still had trouble focusing, and even though he had many friends, he continued to experience difficulty interacting with peers and had mood swings.  Id.  J.T.'s mother reported that J.T. sometimes complained of feeling dizzy after taking Clonidine.  Id.

Dr. Esguerra's treatment notes, dated April 15, 2008, revealed that Keene expressed concern over J.T.'s inability to gain weight and picky eating habits.  Id. at 401.  J.T. was still described as hyperactive and lacked meaningful friendships, but his teachers were happy with his progress and had no complaints. Id.  As a result, the dosage of Concerta was continued at 36 mg, but Clonidine was discontinued because J.T. was sleeping better. Id.

During a doctor's visit on September 18, 2008, Keene again expressed concern about J.T.'s weight.  Id. at 399. Consequently, Dr. Esguerra proposed decreasing the dosage of Concerta to 27 mg daily.  Id. at 400.  During this visit, the doctor observed that J.T. was able to tell time, read for pleasure, and had a sense of humor.  Id. at 399.

J.T. next visited Dr. Esguerra on December 12, 2008.  Id. at 397-98.  The doctor was again told that J.T.'s medication was not working and that his hyperactivity had increased.  Id. at 397. Further, J.T. was having difficulty focusing in school and exhibited behavioral problems such as "acting out," being "disrespectful to adults," and being "impulsive."  Id.  J.T. was increasingly disruptive in class, did not listen well, and had hit other students "because they bother[ed] him."  Id. (internal quotation marks omitted).  Dr. Esguerra diagnosed ADHD and behavioral problems (specifically, aggression and possible oppositional defiant disorder), as well as insufficient weight gain.  Id. at 397-98.  The doctor recommended starting Risperdal to diminish aggression and continuing Concerta for ADHD.  Id. at 398.

J.T.'s continuing trouble with focusing and hyperactivity was noted at a January 22, 2009 visit.  Id. at 395.  The doctor reported that J.T. had been suspended from school for bringing in syringes with needles and that his grades were worsening.  Id. J.T. was described as having several friends and was getting along with his parents.  Id.  Keene reported that Risperdal was not working, so Dr. Esguerra, after raising a question about J.T.'s compliance with his prescription, discontinued that medication.  Id.

**b.    Consulting Physician**

On May 29, 2007, non-examining state agency psychiatrist, Dr. J. Alpert ("Dr. Alpert") completed a Childhood Disability Evaluation Form.  Id. 154-59.  Dr. Alpert found that J.T. had a severe impairment (borderline intellect), but he concluded that the impairment did not meet, medically equal, or functionally equal the listings concerning domain limitations.  Id. at 154. Specifically, J.T. had less than marked limitations with respect to acquiring and using information, attending to and completing tasks, and interacting and relating to others, but had no limitations with respect to moving about and manipulating objects, caring for himself, or his health and physical well-being.  Id. at 156-57.

Dr. Alpert explained that J.T.'s March 2006 IQ scores featured a full-scale score of 79, a performance score of 81, and a verbal score of 77.  Id. at 159.  On speech and language testing, J.T. had an expressive-language score of 84, a receptive-concepts score of 71, and a total-language score of 76. Id.  In terms of social development, J.T. was reportedly able to make friends but required "frequent verbal prompts to leave peers alone as he frequently over step[ped] boundaries."  Id.

**c.   Teacher Questionnaires and Progress Reports**

J.T.'s first-grade teacher at Eagle Point Elementary School, Melissa Shelmerdine ("Shelmerdine"), filled out a Teacher

Questionnaire on March 22, 2007.  Id. at 165-74.  Shelmerdine
stated that J.T. was in the first grade and that his instructional
level at that time, with regard to reading, mathematics, and
written language, was at the first-grade level.  Id. at 165.  She
reported that J.T. received speech services three times per week
and counseling services one half hour per week.  Id.  Shelmerdine
observed that J.T. had no problems relating to the acquisition and
use of information.  Id. at 166.  Shelmerdine further reported
that when J.T. was off of his medications, he had difficulty in
most of the areas touching upon attending and completing tasks
(with very serious problems in focusing long enough to finish an
assigned task, waiting to take turns, and working without
distracting himself and others), and that "[t]he frequency of
problems when he has his meds is much less."  Id. at 167.  With
respect to interacting with and relating to others, Shelmerdine
reported only slight problems, with the exception of J.T.'s
ability to "seek[] attention appropriately."  Id. at 168.
Shelmerdine commented that J.T. had the capacity to finish work
"correctly on an independent level as long as he's focused," which
occurred only when he was on his medication.  Id.  Further,
Shelmerdine reported that J.T. had no difficulty in moving about
and manipulating objects.  Id. at 169.  She then concluded that
J.T. had merely slight problems in almost all areas of caring for
himself but noted that he had obvious problems with regard to

being patient when necessary and responding appropriately to
changes in mood and a serious problem with respect to knowing when
to ask for help.  Id. at 170.  Lastly, Shelmerdine stated that
J.T. took medication on a regular basis and was able to focus and
use more school-appropriate language when medicated.  Id. at 171.

J.T.'s second-grade teacher, K. Gravel ("Gravel"), indicated
in a progress report that J.T., in the first quarter of the school
year, was "very capable of completing second grade work" but that
it was, however, "difficult to get him to read for comprehension
when it is not something he chooses to read.  With behavioral and
pharmaceutical interventions, [J.T.] is better equipped to meet
the challenges of second grade."  Id. at 438.  By the second
quarter, Gravel noted that even "[w]ith the behavioral and
pharmaceutical interventions in place[,] [J.T.] continues to
struggle to sustain mental effort.  His behavior is a distraction
to the other students."  Id.  In the third quarter report, J.T.
"continue[d] to have difficulty sustaining mental effort," and
"[w]hen corrected[,] it [was] difficult for him to stop [being
distractive] even with pharmaceutical interventions."  Id. at 439.

On a January 13, 2009, Teacher Questionnaire, J.T.'s third-
grade teacher at Eagle Point Elementary School, Shelette Pleat
("Pleat"), stated that she had known J.T. for five months and saw
him five days per week.  Id. at 427.  Pleat noted that J.T. was at
the first-grade level in reading, math, and written language.  Id.

With regard to acquiring and using information, she stated that
J.T. had serious problems in "[c]omprehending and doing math
problems," "[u]nderstanding and participating in class
discussions," "[p]roviding organized oral explanations," and
"[r]ecalling and applying previously learned material."  <u>Id.</u> at
428.  Further, J.T. had very serious problems in "[e]xpressing
ideas in written form," "[l]earning new material," and "[a]pplying
problem-solving skills in class discussions."  <u>Id.</u>  Pleat also
indicated that "[J.T.] is not independent at all when it comes to
his school work.  [J.T.] receives extra support in Reading,
Speech, as well as monthly consultations [with occupational
therapists, physical therapists,] and [the] school social worker."
<u>Id.</u>  With regard to attending and completing tasks, the teacher
indicated that J.T. had very serious problems in almost all areas.
<u>Id.</u> at 430.  With regard to interacting and relating to others,
the teacher stated that J.T. had serious or very serious problems
in almost all areas.  <u>Id.</u> at 431.  Pleat noted that a behavior
plan had been put into place but explained that J.T. had been
moved several times and currently was in a change-of-school plan.
<u>Id.</u>  She further stated that J.T. was "always getting extra help"
and that he required one-on-one support at times.  <u>Id.</u>  Pleat also
noted that J.T. had no problems in moving about and manipulating
objects.  <u>Id.</u> at 432.  With respect to J.T.'s ability to care for
himself, Pleat indicated serious problems in six out of the ten

listed activities.  Id. at 433.

    **d.**   **Individualized Educational Plans**

        **(I)**        **2006-2007 School Year**

In March 2006, the Albany City School District developed an Individualized Education Plan ("IEP") for J.T. for the first grade, which was scheduled to begin in the fall of the 2006-2007 school year.  Id. at 208-17.  J.T. was classified as speech/language impaired.  Id. at 208.  J.T. was described as "a student who required a substantial amount of mobility."  Id. at 210.  The IEP stated that (1) J.T.'s general intellectual functioning fell within the deficient/borderline-to-low average range when compared against other students of his same age; (2) J.T. had difficulty solving problems using his "knowledge, long-term memory, and . . . language"; and (3) J.T.'s ability to "acquire, retain, and retrieve general factual knowledge was delayed."  Id.  J.T. demonstrated strengths, however, in word and letter-sound identification.  Id.  Further, he was reading at grade level and could visually identify numbers through 100.  Id. It was, however, noted, that J.T. was "learning at a slower rate than his peers."  Id.  J.T. had a sight-word vocabulary of forty-six words and could employ them in writing, so long as he was given "reminders."  Id.  It was also noted that the use of medication had greatly improved J.T.'s focus and heightened the attention paid to tasks at hand.  Id.

11

In the area of social development, J.T. was making friends, but he needed sensory integration for the first hour and a half of his day in order to be attentive and focused during the remainder of the day. Id. Because J.T. would often yell at and attempt to push his peers, he was frequently instructed to leave them alone. Id. The School District recommended placement in an integrated class with a 12:1:1 student-aide-teacher ratio, in addition to weekly counseling, group occupational therapy services twice a week, and speech therapy three times a week. Id. at 213.

### (ii) 2007-2008 School Year

The Albany City School District conducted an annual review in April 2007 of J.T.'s need for continued special education for second grade. Id. at 384-86. J.T.'s IEP for the 2007-2008 school year continued to show that J.T. was a speech/language-impaired child in need of services to properly treat his ADHD. Id. at 372.

Specifically, test results generated by a CELF-4 test[4] administered on January 18, 2007, showed that J.T. received an expressive-language score of 73 and a receptive-language score of the same value. Id. at 385. The occupational therapist reported gains in all areas and recommended decreasing occupational therapy to once a week. Id. at 386. J.T. had difficulty interpreting nonverbal communications; thus, a weekly group counseling session

---

[4] CELF-4 stands for "Clinical Evaluation of Language Fundamentals - Fourth Edition."

12

was continued and an individual in-class counseling session once a week was added.  Id. at 384.  J.T. continued to have "difficulty comprehending concepts and following directions"; the occupational therapist ultimately recommended speech therapy at the same level. Id. at 385.

(iii)      2008-2009 School Year

The IEP for the 2008-2009 third-grade school year was originally drafted in January 2009 but was modified shortly thereafter after a behavioral incident involving J.T. resulted in his suspension from school.  See Pl.'s Mem. 13.  J.T. was reassigned for a period of two months to North Albany Academy and placed in a self-contained classroom there.  Id. at 13; see also Admin. R. at 448.  J.T. returned to Eagle Point Elementary School on March 9, 2009.  Pl.'s Mem. 13.

Test results on the CELF-4 administered in January 2008, indicated an expressive-language score of 89 and a receptive-language score of 67.  Admin. R. at 450, 454.  J.T.'s performance was "average in broad reading, basic reading skills, and basic writing skills, low average in written expression, low in mathematics and very low in math calculation skills."  Id. at 455. Further, J.T. exhibited a high level of activity, which made it more difficult for him to hold his attention.  Id.  J.T. was learning at a slower rate than his peers, and "[t]he use of medication therapy improve[d] his focus and attention to task[s]."

13

Id. J.T. could "visually identify the numbers through 100," and could "match a quantity to them." Id. J.T. had average grammatical skills and continued to demonstrate below-average auditory memory skills. Id. In the area of social development, J.T. "continue[d] to require sensory integration for the first hour and a half of his day," as well as "frequent verbal prompts." Id. J.T. was making friends but, at times, was found directing or distracting them. Id. Further, "[w]ithout medication therapy, [J.T. had] a very difficult time functioning in a school setting." Id. J.T. typically needed to sit near the teacher during class time, and the teacher generally had to deliver instructions to J.T. individually after having delivered instructions to the entire class. Id. at 456. Finally, after receiving his medication, J.T. became independent for the remainder of the day, but he nevertheless required movement every fifteen minutes. Id.

**e.   Hearing Testimony**

At the hearing on March 13, 2009, both Keene and J.T. testified. See id. at 8-38. Keene testified first. She stated that she typically wakes her son up at 6:30 AM and lays his clothes out, and he dresses himself. Id. at 16. Then, after having breakfast, J.T. goes to the bus stop and waits for the bus to come. Id. at 17. Keene makes J.T. do his homework immediately upon arriving home from school and prepares dinner for him, even

14

though J.T. usually lacked an appetite because of the medication
he is taking.  Id. at 17-19.  After homework is done, J.T.
generally watches television or plays games.  Id. at 19.  Further,
Keene testified that J.T. took medications every morning; a social
worker, however, informed her that the medication was not working
and that J.T. was not focused at school.  Id. at 20.  Both in
school and at home, J.T. was very active and constantly moved
around.  Id. at 23-24.  Keene explained that she missed several of
J.T.'s doctor's appointments because of transportation
difficulties.  Id. at 29.

J.T. testified that he liked his school, his teacher, and his
class.  Id. at 32.  He also noted that his grades were good.  Id.
at 32-33.  J.T. testified that he liked taking medication because
it helped to subdue his hyperactivity.  Id. at 34.  J.T. also
stated that he likes reading comic books.  Id. at 35.  When asked
whether he has friends, J.T. testified that he had two good
friends living in his neighborhood.  Id. at 35-36.

## II.  DISCUSSION

### A.   Standard of Review

The Court's role in reviewing a social security disability
case is to determine whether appropriate legal standards were
applied in the denial of benefits and whether the hearing
officer's findings of fact are supported by substantial evidence.
Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996).  The Court should

15

set aside an administrative decision "only where it is based upon legal error or is not supported by substantial evidence." Roma v. Astrue, No. 10-4351-cv, 2012 WL 147899, at *1 (2d Cir. Jan. 19, 2012) (quoting Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999)) (internal quotation mark omitted). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)) (internal quotation marks omitted). "'[W]here there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards,' the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence." Jaskiewicz v. Comm'r of Soc. Sec., No. 3:08-CV-379, 2010 WL 5138477, at *2 (N.D.N.Y. Dec. 10, 2010) (quoting Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

An individual under the age of eighteen is disabled if he or she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). With respect to claims filed on behalf of children, the Social Security Administration has established a three-step sequential evaluation

process to determine whether a child is disabled.  <u>See</u> 20 C.F.R. §
416.924(a), <u>see also</u> <u>Ramos ex rel. Soto</u> v. <u>Barnhart</u>, No.
02Civ.3127(LAP)(GWG), 2003 WL 21032012, at *7 (S.D.N.Y. May 6,
2003); <u>Kittles ex rel. Lawton</u> v. <u>Barnhart</u>, 245 F. Supp. 2d 479,
487-88 (E.D.N.Y. 2003).  At step one, the hearing officer must
determine whether the claimant is engaged in substantial gainful
activity.  <u>See</u> 20 C.F.R. § 416.924(b); <u>see also</u> <u>Kittles</u>, 245 F.
Supp. 2d at 488.  If the claimant is not engaging in substantial
gainful activity, the analysis proceeds to the second step, at
which the hearing officer must determine whether the claimant has
a medically determinable "severe" impairment or a combination of
impairments that is "severe."  20 C.F.R. § 416.924(c); <u>see</u>
<u>Kittles</u>, 245 F. Supp. 2d at 488.  If the claimant has a severe
impairment, the hearing officer proceeds to the third step to
determine whether the claimant has an impairment or combination of
impairments that meets or medically equals a presumptively
disabling condition identified in one of the listings of
impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1
(the "Listing"); equivalence to a listed condition can be either
medical or functional.  <u>See</u> 20 C.F.R. § 416.924(d); 20 C.F.R. pt.
404, subpt. P, app. 1.; <u>see also</u> <u>Kittles</u>, 245 F. Supp. 2d at 488.

    A child's functional limitations are evaluated in accordance

with the following six main areas, referred to as "domains"[5]:

      (I) Acquiring and using information;
      (ii) Attending and completing tasks;
      (iii) Interacting and relating with others;
      (iv) Moving about and manipulating objects;
      (v)  Caring for yourself; and,
      (vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(I)-(vi).  A medically determinable impairment or combination of impairments functionally equals a listed impairment if it "results in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." Id. § 416.926a(a); see also Ramos, 2003 WL 21032012, at *8.  An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(I). A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  Id. § 416.926a(e)(2)(I).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).

---

[5] The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do."  20 C.F.R. § 416.926a(b)(1).

**B.    Hearing Officer's Decision**

On April 24, 2009, the hearing officer rendered a decision on J.T.'s eligibility for SSI benefits.  Admin. R. at 56.  The hearing officer noted that J.T. was born on February 28, 1999, and thus was a "school-age child" on the date the application for benefits was filed.  Id. at 46.  In his findings of fact and conclusions of law, the hearing officer concluded that J.T. had not engaged in substantial gainful activity at any relevant time. Id.  The hearing officer then found that J.T. had severe impairments, including ADHD and borderline intellectual functioning disorder.  Id.  The hearing officer, however, emphasized that "[w]hen he receives appropriate medical treatment, the claimant is able to focus, concentrate, complete tasks and behave appropriately."  Id. at 47.  The hearing officer also pointed out that Keene frequently failed to bring her son to his medical appointments and that J.T.'s treating physician had questioned Keene's compliance with J.T.'s medication regime.  Id. at 50.

The hearing officer further concluded that J.T. did not have an impairment or combination of impairments that meets or medically equals one of the impairments in the Listing.  Id. at 46.  In addition, the hearing officer stated that J.T. did not have an impairment or combination of impairments that functionally equals a condition in the Listing.  Id.

19

As to the six domains of function, the hearing officer determined that J.T. had: (1) less than marked limitation in acquiring and using information; (2) less than marked limitation in attending and completing tasks; (3) less than marked limitation in interacting and relating with others; (4) no limitation in moving about and manipulating objects; (5) no limitation in the ability to care for himself; and (6) no limitation in health and physical well-being.  Id. at 52-56.

In analyzing the area of acquiring and using information, the hearing officer looked at J.T.'s intellectual testing results.  In particular, the hearing officer relied on WPPSI[6] testing conducted on March 20, 2006, CELF-4 testing conducted on January 18, 2007, and academic testing conducted in 2007.  Id. at 52.

In analyzing the area of attending and completing tasks, the hearing officer concluded, without pointing to any concrete evidence in the record, that J.T.'s ability to appropriately attend to and complete tasks when properly medicated counseled against a finding of disability.  Id. at 53.

When considering J.T.'s ability to interact and relate with others, the hearing officer emphasized that J.T. "was described as a child who was at the center of and directing his peers" and "demonstrates out-of control behavior" only when he is not

_____

[6] WPPSI - which stands for the "Wechsler Preschool and Primary Scale of Intelligence" - is an intelligence test administered to young children.

medicated.  Id. at 54.

    With respect to moving about and manipulating objects and
caring for himself, the hearing officer summarily concluded that
J.T. had no limitations in these domains.  Id. at 55.


    **C.   Analysis**

    Keene appeals two separate issues.  Pl.'s Mem. 1.  First,
Keene challenges the hearing officer's conclusion that J.T.'s
impairments were not functionally equivalent to a listed
impairment.  Id.  Specifically, Keene argues that "the evidence
supports a finding that J.T. suffers from a marked limitation in
the domains of acquiring and using information, attending and
completing tasks, and interacting and relating with others."  Id.
at 17.  Second, Keene argues that the hearing officer did not
"properly consider the effect of medication and a structured
setting."  Id. at 1.

    **1.   Acquiring and Using Information**

    This domain focuses on the degree to which a child is able to
acquire or learn information and to use the information that she
has learned.  20 C.F.R. § 416.926a(g).  A school-age child (that
is, one who is between the ages of six and twelve) should be able
to read, write, perform math calculations, and discuss history and
science.  Id. § 416.926a(g)(2)(iv).  Moreover, such a child should
have the capacity to demonstrate these skills in both academic and

daily living settings.  Id.

The Code of Federal Regulations (the "Regulations") offers a number of examples of limited functioning with respect to this domain.  For example, a child might display limited functioning if she does not "demonstrate understanding of words about space, size, or time" or has "difficulty solving mathematical problems." Id. § 416.926a(g)(3)(I), (iv).

This Court holds that in reaching the conclusion that J.T. has less than marked limitation in acquiring and using information, the hearing officer did not sufficiently weigh the evidence of the record.  The hearing officer's discussion with respect to this domain is limited to a single paragraph, in which he points out J.T.'s scores on the WPPSI test administered on March 20, 2006 - without explaining what the scores meant - and J.T.'s scores on the CELF-4 test given on January 18, 2007. Admin. R. at 52.  Further, the hearing officer noted that "[a]cademic testing from 2007 indicated that the claimant's performance was average with respect to his broad reading skills, basic reading skills and basic writing skills and was low average with respect to his written expression skills, was low in mathematics skills and was very low with regard to his math calculation skills."  Id.

The hearing officer's conclusion is flawed for three reasons. First, the hearing officer does not thoroughly explain what the

cited testing scores mean.  J.T.'s consulting physician stated
that J.T. had "borderline intellect," id. at 154, and the hearing
officer himself found that J.T.'s written expression skills,
mathematics skills, and math calculation skills fell within the
low average, low, and very low ranges, respectively.  Id. at 52.
"Although the scores may not be low enough to meet the clinical
definition of mental retardation, this does not mean that Claimant
has a less than marked impairment with respect to acquiring and
using information."  Dabul-Montini ex rel. N.D. v. Astrue, No. 09-
CV-966 (TJM/VEB), 2010 WL 3584348, at *6 (N.D.N.Y. July 30, 2010);
see also id. ("A child of normal intelligence can also be
cognitively impaired if some condition other than a low IQ
severely affects the child's ability to progress in the skills
involved in reading, writing, and arithmetic." (quoting Carballo
ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 218 (S.D.N.Y. 1999))
(internal quotation mark omitted)).  Second, the hearing officer
failed to consider the entire record and identify any evidence
that supported an alternative conclusion.  See Schaal v. Apfel,
134 F.3d 496, 504 (2d Cir. 1998) (holding that it is the hearing
officer's obligation "to weigh the conflicting evidence in the
record"); Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289
(E.D.N.Y. 2004) ("It is not proper for the [hearing officer] to
simply pick and choose from the transcript only such evidence that
supports his determination, without affording consideration to

evidence supporting the plaintiff's claims."). Third, the hearing officer did not detail the particular weight accorded to supporting and contradicting evidence drawn from the record and failed to provide sufficiently concretized justifications for his finding. See Gravel v. Barnhart, 360 F. Supp. 2d 442, 444–45 (N.D.N.Y. 2005) (noting that a hearing officer "must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision"); cf. Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988) (holding that a finding that a witness is not credible must be explained "with sufficient specificity to permit intelligible plenary review of the record"). Here, the hearing officer did not justify his findings with any evidence beyond the testing scores, and he made no attempt at all to reconcile contrary evidence. For instance, Pleat, who observed J.T. in class five days per week, reported that with regard to acquiring and using information, J.T. had a serious problem comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations, and recalling and applying previously learned material. Admin. R. at 428. She reported further that J.T. had very serious problems expressing ideas in written form, learning new material, and applying problem-solving skills in class

discussions.[7]  Id.  Furthermore, while J.T.'s first-grade teacher,
Shelmerdine, reported that J.T.'s skills regarding reading, math,
and written language resided at his actual grade level, id. at
165, by the third grade, J.T. was still functioning at a first-
grade level of instruction, id. at 427.  In addition, the 2006-
2007 and 2008-2009 IEPs both stated than J.T. could visually
identify numbers only through 100, id. at 210, 455, which shows
that J.T. did not make any improvement in two years in his ability
to identify numbers.  Finally, although he emphasized the scores
that J.T. received from the CELF-4 test administered on January
18, 2007, the hearing officer ignored the test scores from a

---

[7] Notably, in his memorandum, the Commissioner stated that
the hearing officer "was not required to give Ms. Pleat's report
greater weight than the conclusions of medical professionals."
Def.'s Mem. 8.  This determination, however, was for the hearing
officer to make.  Besides, the case law emphasizes the importance
of a child's teachers' evaluations.  See, e.g., Quinones ex rel.
Quinones v. Chater, 117 F.3d 29, 35 (2d Cir. 1997) ("We think
that the reports of the psychologists are at best inconclusive
with respect to [the claimant's] concentration, persistence, and
pace.  Standing against the reports of [the claimant's] teachers,
who dealt with her on a daily basis over at least a school year,
these reports do not by themselves amount to 'substantial
evidence' supporting the Commissioner's finding." (emphasis
added)).  As discussed, the hearing officer's decision did not
even mention the weight given or the credibility determinations
made with respect to any evidence in the record.

In addition, although the Commissioner in his memorandum
emphasized the findings of a disability evaluation performed by a
state psychological consultant named Lisa Newman, Def.'s Mem. at
8, 10, 14, 17, the hearing officer made no reference to this
evaluation in his decision, further confirming that the hearing
officer failed to consider the entire record.

January 14, 2008, administration of the test, which revealed an increase in J.T.'s expressive-language score and a drop in his receptive-language score. Id. at 450.

Even if the hearing officer's ultimate conclusion was potentially supportable, the Court ought not affirm a decision where there is a reasonable basis for doubting whether the appropriate legal standards were applied. See Jaskiewicz, 2010 WL 5138477, at *2.

As a result, the Court remands to the administrative agency the issue of whether the record evidence supports a finding that J.T. has less than a marked limitation in acquiring and using information.

### 2. Attending and Completing Tasks

With regard to attending and completing tasks, the Commissioner considers a child's ability "to focus and maintain . . . attention, and how well [she can] begin, carry through, and finish . . . activities, including the pace at which [she] perform[s] activities and the ease with which [she] change[s] them." 20 C.F.R. § 416.926a(h). A school-age child is expected to be capable of focusing her attention in myriad situations in order to properly follow directions, remember and organize school materials, and complete schoolwork in the classroom and at home. Id. § 416.926a(h)(2)(iv). The child should have the capacity to "concentrate on details and not make careless mistakes in . . .

26

work (beyond what would be expected in other children [of like] age who do not have impairments).” Id. The child should also be able to “change activities or routines without distracting [himself] or others, and stay on task and in place when appropriate.” Id.

The Regulations provide various examples of limited functioning with respect to this domain. For example, a child might have limited functioning if she is “easily startled, distracted, or overreactive to sounds, sights, movements, or touch”; “slow to focus on, or fail[s] to complete activities of interest”; “repeatedly become[s] sidetracked from . . . activities or . . . frequently interrupts others”; becomes “easily frustrated and give[s] up on tasks”; or “require[s] extra supervision to [remain] engaged in an activity.” Id. § 416.926a(h)(3)(I)-(v).

The hearing officer found that J.T. had less than marked limitation in this domain. Admin. R. at 53. Again, while considering this domain, the hearing officer, instead of referring to and weighing the evidence in support of his finding, offered only two sentences: “When the claimant is appropriately medicated and assuming medication compliance, he is able to appropriately attend to and complete tasks. However, when the claimant is not appropriately medicated, he has a considerable amount of difficulty in this area.” Id.

The record contains contradictory evidence. For instance,

27

Pleat indicated that J.T. had very serious problems in almost all areas of attending to and completing tasks. <u>Id.</u> at 430. Gravel noted that "[w]ith the behavioral and pharmaceutical interventions in place[,] [J.T.] continues to struggle to sustain mental effort. His behavior is a distraction to the other students." <u>Id.</u> at 438. Gravel further reported that, in the third quarter of second grade, J.T. "[c]ontinue[d] to have difficulty sustaining mental effort," and "[w]hen corrected[,] it [was] difficult for him to stop [being distractive] even with pharmaceutical interventions." <u>Id.</u> at 439. In addition, Dr. Esguerra's notes show that over a four-year course of treatment, the type or dosage of J.T.'s medications were changed at least twelve times because either J.T.'s mother, his teachers, or the school nurse complained that the current prescriptions were not working. <u>See, e.g.</u>, <u>id.</u> at 161, 163, 182, 184, 186, 189, 190-91, 194, 204, 390, 394-95, 397-98. During the last two visits on December 12, 2008, and January 22, 2009, Dr. Esguerra noted that J.T.'s hyperactivity was increasing and that he was having trouble focusing. <u>Id.</u> at 395, 397. As a result, when the record is read in its entirety, it is unclear whether the medications were in fact effective on a consistent basis. Importantly, the hearing officer did not consider the effect, if any, these constant changes had on J.T.'s functioning. <u>See</u> <u>id.</u> at 53.

Accordingly, the Court remands to the administrative agency

the issue of whether the record evidence supports a finding that J.T. has less than marked limitation in attending and completing tasks.

### 3.   Interacting and Relating

This domain considers how well a child "initiate[s] and sustain[s] emotional connections with others, . . . compl[ies] with rules, respond[s] to criticism, and respect[s] and takes care of the possessions of others."  20 C.F.R. § 416.926a(i)(1).  A school-age child should be able to develop lasting relationships with children of her same age.  Id. § 416.926a(i)(2)(iv).  The child should begin to "understand how to work in groups"; have an "increasing ability to understand another's point of view and to tolerate differences"; and "talk to people of all ages, . . . share ideas, tell stories, and . . . speak in a manner that both familiar and unfamiliar listeners readily understand."  Id.

The Regulations provide examples of limited functioning with respect to this domain.  For example, a child might have limited functioning if she "ha[s] no close friends"; "avoids or withdraws from people [she] know[s], or [is] overly anxious or fearful of meeting new people or trying new experiences"; or "ha[s] difficulty communicating with others . . . or in asking others for assistance."  Id. §416.926a(i)(3)(ii)-(iii), (3)(v).

In analyzing this domain, the hearing officer again simply stated summarily that "[w]hen appropriately medicated the claimant

has no difficulty interacting with peers and adults. . . .
Therefore, since his impairment is controllable by appropriate
medication and medical follow through it is concluded that his
impairments in this domain are less than marked." Admin. R. at
54.

        The hearing officer's reasoning is flawed in the following
two respects[8]: First, he failed to explain the weight he gave to
particular evidence in the record and, if applicable, why the
weight of certain evidence superceded that of other evidence.
Second, the hearing officer made no meaningful attempt to
reconcile his finding of less than marked limitation with
contradictory evidence in the record.  All of J.T.'s IEPs stated
that during the time it takes for J.T.'s medication to become
effective, J.T. required "frequent verbal prompts to leave peers
alone as he frequently over-steps boundaries.  He will yell at
them or attempt to push them to do what he wants."  Id. at 210;
see also id. at 375, 455.  Further, even while medicated, J.T. had

_____

        [8] In his memorandum, the Commissioner did highlight a report
dated December 6, 2005, which was filled out by another one of
J.T.'s teachers, Cynthia Clo ("Clo").  In the report, Clo stated
that J.T. made positive gains in interacting and relating to
others while on medication, which indicated that J.T. had no
problem, only a slight problem, or no obvious problem in this
domain.  Def.'s Mem. 16.  Further, the Commissioner noted that
just one month later, Clo reported that J.T. had no problems or
only slight problems in areas within the domain of interacting
and relating with others.  Id.  The hearing officer, whose
decision this Court is reviewing, did not mention either of Clo's
reports in his decision.  Accordingly, this Court need not
address their application to the analysis here.

difficulty maintaining silence during group counseling sessions when others students were speaking, and he frequently interrupted and provoked them. Id. at 455. Shelmerdine reported that J.T. had serious problems seeking attention appropriately. Id. at 168. Gravel noted that even "[w]ith the behavioral and pharmaceutical interventions in place[,] [J.T.] continues to struggle to sustain mental effort. His behavior is a distraction to the other students." Id. at 438. Gravel wrote in his third-quarter report that J.T. "continue[d] to have difficulty sustaining mental effort," and "[w]hen corrected[,] it [was] difficult for him to stop [being distractive] even with pharmaceutical interventions." Id. at 439. Pleat noted that J.T. had very serious problems playing co-operatively with other children and expressing anger appropriately; he also had serious problems making and keeping friends, seeking attention appropriately, using appropriate language, and taking turns in conversation. Id. at 431. Finally, Dr. Esguerra's October 22, 2007, notes indicated that J.T. was hyperactive, had problems focusing, is easy distractable, took longer than average to complete homework assignments, and had difficulty interacting with his peers. Id. at 394.

For the foregoing reasons, the Court remands to the administrative agency the issue of whether the record evidence supports a finding that J.T. has less than marked limitation in interacting and relating.

###### 4.    Effects of Medication and a Structured Setting

Keene is also arguing that the hearing officer failed to consider the absence of a structured and supportive setting and the effects of medication on J.T.'s behavior.[9]  Pl.'s Mem. 17. The hearing officer's failure to develop the record is most apparent with respect to this domain.  The question is whether J.T. is limited in his ability to interact with and relate to others.  J.T. lives with several other people, only one of whom (his mother) testified.  It appears as though the hearing officer did not ask Keene or J.T. sufficient questions about J.T.'s level of functioning outside of school (like whether he had close friends, was afraid of meeting new people, generally asked for assistance, and so on).  See 20 C.F.R. § 416.926a(i)(3)(ii)-(iii),

---

[9] The Regulations provide that:

> A structured or supportive setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting.  Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting.  Even if you are able to function adequately in the structured or supportive setting, we must consider how you function in other settings and whether you would continue to function at an adequate level without the structured or supportive setting.

20 C.F.R. § 416.924a(b)(5)(iv)(C).

(vi).  The hearing officer was obligated to develop the record
regarding J.T.'s functioning outside of the structured school
setting.  See Cavanaugh ex rel. J.M.C. v. Astrue, No. 1:08-CV-0637
(LEK/VEB), 2009 WL 4264370, at *7 (N.D.N.Y. Nov. 20, 2009)
(emphasizing that the "Commissioner's regulations require the
[hearing officer] to consider the effects of a structured or
highly supportive setting . . . on the claimant's functioning and,
if the claimant's symptoms or signs are controlled or reduced by
the structured environment, the [hearing officer] is required to
consider the claimant's functioning outside of the highly
structured setting" (quoting Smith v. Massanari, No, 00-CV-00402,
2002 WL 34242375, at *6 (W.D.N.Y. Mar. 17, 2002)) (internal
quotation marks omitted)); Williams ex rel. D.A.W. v. Astrue, No.
08 Civ. 6375(LBS), 2009 WL 3754391, at *9 (S.D.N.Y. Nov. 5, 2009)
(commenting that "[i]mprovement[s] based on a structured special
education environment and the efforts of teachers and therapists
is insufficient to support a finding that [the claimant's]
limitations are not marked").

   Also, the hearing officer failed to determine the
effectiveness of J.T.'s medications in light of the record
evidence revealing frequent changes in the type and dosage of his
medications.  See, eg., Roelandt ex. rel. Roelandt v. Apfel, 125
F. Supp. 2d 1138, 1148 (S.D. Iowa 2001) (holding that medication
designed to treat ADHD may be deemed effective only if it

diminishes the severity of an impairment "on a consistent basis").

This Court therefore remands for further development and consideration of the effects of a structured and supportive setting and medication.

**IV.  CONCLUSION**

For the foregoing reasons, it is hereby ORDERED that the Commissioner's decision denying SSI benefits is REVERSED; it is further ORDERED that this case be REMANDED to the hearing officer for further evaluation consistent with this opinion.

**SO ORDERED.**

**Dated:** October 24, 2012

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE